**STATE of Minnesota, Petitioner, Appellant,**

v.

**John Mark COLOSIMO, Respondent.**

No. C7–01–2181.

Supreme Court of Minnesota.

Sept. 25, 2003.

Mike Hatch, Minnesota Attorney General, St. Paul, MN, Alan L. Mitchell, St. Louis County Attorney, by Jeffrey M. Vlatkovich, Assistant County Attorney, Hibbing, MN, for Appellant.

John M. Colosimo (Pro se), Virginia, MN, for Respondent.

Teresa Nelson, Minnesota Civil Liberties Union, St. Paul, MN, by Howard S. Carp, Volunteer Attorney on Behalf of Minnesota Civil Liberties Union, Minneapolis, MN, for Amici Curiae.

## OPINION

GILBERT, Justice.

Respondent John M. Colosimo was convicted for refusal to allow inspection of a boat, Minn.Stat. § 97A.251, subd. 1(3) (2000). Colosimo challenged his conviction arguing he was unlawfully stopped by the conservation officer, the officer did not have probable cause to inspect the boat and the request to inspect the boat was an unlawful seizure. The court of appeals reversed the conviction concluding that the conservation officer was required to have probable cause to request inspection of Colosimo's boat and that because the officer did not have probable cause to request inspection, Colosimo could not be convicted for refusing inspection. We reverse.

Colosimo was on a fishing trip with four other men on Rainy Lake at Kettle Falls in the Voyageur's National Park. On the morning of September 18, 2000, the group stowed their personal belongings on Colosimo's open bow boat in order to make the trip back to the far shore of Lake Namakan where they had left their vehicles. To get from Rainy Lake, where they had been fishing, to Lake Namakan required portage. Colosimo's boat was being trailored by a truck driven by Shawn Obeson, who was employed portaging boats between the two lakes.

Obeson described the boat as a 19– or 20–foot Crestliner fishing boat, which contained the fishing party's luggage and a cooler or two. Obeson testified that he had loaded Colosimo's boat on to his trailer, and portaged the boat, while the entire fishing party rode in the boat. During the portage, as Obeson was about to put the boat in the Lake Namakan side of the portage, he saw Officer Lloyd Steen, a uniformed Department of Natural Resources (DNR) officer, walking towards the truck. Obeson stopped the truck at that point. When asked at Colosimo's trial the reason he stopped, Obeson testified, "Well I stopped to unhook John's [Colosimo's] boat there." When asked if Officer Steen did anything to cause Obeson to

stop, Obeson testified, "No, he didn't. He didn't stop me."

Officer Steen testified that he knew where the portage truck operator would stop in order to unhook the boat and receive payment for the portage and he waited in that vicinity. Once the operator had stopped the truck to unhook the boat Officer Steen walked up to the boat and struck up a conversation with Colosimo, who was sitting at the steering wheel of the boat. Officer Steen asked if they had caught any fish. Colosimo responded that they had caught some. Officer Steen asked how many they had; Colosimo responded that they had not been fishing that day and had less than their limit. Officer Steen next asked how they had the fish packaged. Colosimo said they had gutted and gilled the fish in accordance with the regulations affecting Rainy Lake.

Officer Steen eventually asked if he could take a look at the fish; Colosimo refused that request. The refusal to allow the inspection of the fish started an argument between the officer and Colosimo, an attorney, over the officer's legal authority to board the boat to inspect the catch. Officer Steen told the portage truck driver not to put the boat in the water. Colosimo was equally adamant in telling the driver to put the boat into the water.

Realizing that he and Colosimo were at an impasse and fearing that the argument would escalate into a physical confrontation, Officer Steen issued Colosimo a ticket for failing to present wildlife for inspection, Minn.Stat. § 97A.251, subd. 2, and allowed the group to go along their way. Later, upon reviewing the relevant statutes, Officer Steen sent Colosimo a separate ticket citing him for obstructing an officer in violation of Minn.Stat. § 97A.251, subd. 1, and refusing to allow inspection of a boat being used to transport wild animals, Minn.Stat. § 97A.251, subd. 3.

The parties agreed to a bench trial. A bench trial was held and the court issued findings of fact, conclusions of law, a verdict and memorandum. The district court concluded that the case consisted of two legal issues: first, whether there was a stop, and second, did the officer have the authority to inspect Colosimo's boat once it had been established that Colosimo had been fishing and was transporting fish. The court held that approaching the boat did not amount to a stop, concluding that once the conservation officer determined the individual had engaged in fishing, the officer had the authority to inspect the boat pursuant to Minn.Stat. § 97A.251. The court then found Colosimo guilty of refusal to allow inspection of a boat, Minn. Stat. § 97A.251, subd. 1(3) and assessed a fine of $100, plus a $37 surcharge. Colosimo appealed the conviction to the Minnesota Court of Appeals. The court of appeals reversed the district court, concluding that in order to inspect Colosimo's boat the officer must have probable cause of a violation of a fish or game law. The court held that because the officer did not have authority to inspect the boat, Colosimo could not be convicted for refusal to allow inspection of the boat. *State v. Colosimo*, 648 N.W.2d 271, 276 (Minn.App. 2002)

I.

Colosimo contends that Officer Steen stopped his fishing party and that the stop was prohibited by the Fourth Amendment. Colosimo testified that he initially objected to the conservation officer's attempts to converse by asking what the officer's reasonable articulable suspicion for this "stop" was. However, Officer Steen and members of Colosimo's fishing party testified that the conversation began with Officer Steen asking about fish and that Colosimo then stated that the group had been fish-

ing the previous days, and was transporting gutted and gilled fish. The district court found that there "was no stop in the present case" and cited the testimony of the portage operator that he stopped on his own volition, not because of anything that Officer Steen said or did and that an officer's act of approaching a parked vehicle does not constitute a stop for Fourth Amendment purposes.

■ Colosimo, in his brief to this court, cites *Delaware v. Prouse*, 440 U.S. 648, 99 S.Ct. 1391, 59 L.Ed.2d 660 (1979), where the United States Supreme Court concluded that random suspicionless stops of drivers violated the Fourth Amendment. However, as the district court properly concluded, the initial interaction between Officer Steen and Colosimo did not amount to a stop. Rather, Officer Steen merely began conversing with Colosimo after the portage truck driver had on his own volition stopped the truck pulling the trailer upon which Colosimo's boat rested. Thus, we are presented with a situation quite distinct from that facing the Court in *Prouse*. Here, Officer Steen walked up to the already stopped boat that rested on the trailer of a parked truck. As the district court found, there is no seizure for Fourth Amendment purposes when an officer merely walks up to a parked motor vehicle and converses with the driver. *See State v. Vohnoutka*, 292 N.W.2d 756 (Minn. 1980); *see also Crawford v. Comm'r of Public Safety*, 441 N.W.2d 837 (Minn.App. 1989). Likewise, we hold that Officer Steen walking up to Colosimo and conversing with him while Colosimo's boat rested on the trailer of a parked portage truck does not amount to a seizure for Fourth Amendment purposes. *See Matter of Welfare of E.D.J.*, 502 N.W.2d 779, 782 (Minn. 1993) (generally an officer approaching and asking questions of a person standing on a public street or sitting in a parked car is not a seizure).

There may be little doubt that after Colosimo admitted to having been fishing and the fact that he was transporting fish, he was seized by Officer Steen. However, the seizure came after Colosimo's admission to transporting fish and subsequent refusal to allow inspection of the catch or boat where the catch was being transported. At that point the seizure was not suspicionless, but rather, was based on the fact that Colosimo admitted to transporting fish in his boat, but refused to allow inspection of the boat, a violation of Minnesota law. Minn.Stat. § 97A.251, subd. 1(3). Because the parties dispute the constitutionality of this statute, we now turn to that issue.

II.

The remaining question before us is whether Officer Steen had the authority to search Colosimo's open boat for the purpose of inspecting fish that appellant admitted transporting. The fish that were admittedly in Colosimo's possession are subject to an array of rules designed to protect recreational fishing against depletion. These rules include licensing, daily and possession limits, size, species, season, location, bait, preparation and fishing method requirements and many other rules established in numerous statutes and regulations. *See* Minn. R. 6264.0300, subps. 1 & 56 (2001) and Minn.Stat. § 97C (2002).

In a typical Fourth Amendment case, an appellate court has the opportunity to review the specific facts of the challenged search to determine whether the search violated the defendant's Fourth Amendment rights. In this case, no search occurred. Rather, Officer Steen issued a ticket for refusing to allow an inspection of Colosimo's motorboat used to transport

wild game fish. Thus, we must determine whether a nonconsensual search of the boat, being used to take or transport game fish in the field, could have occurred within the limits imposed by the Fourth Amendment.

■ The Fourth Amendment prohibits "unreasonable searches and seizures." U.S. Const. amend. IV. For a search to be held unconstitutional under the Fourth Amendment the one searched must have had an "actual expectation of privacy" in the area searched and that expectation of privacy must be "one that society is prepared to recognize as reasonable." *Bond v. United States*, 529 U.S. 334, 338, 120 S.Ct. 1462, 146 L.Ed.2d 365 (2000). In this case, as the district court found, Colosimo refused to allow inspection of his boat out of principle because he "truly believes that the officer could not legally search his boat."

We must decide whether under these circumstances Colosimo had a reasonable expectation of privacy. We have stated the "existence of probable cause is relevant only when a person has demonstrated a legitimate or reasonable expectation of privacy." *State v. Sorenson*, 441 N.W.2d 455, 458, 460 (Minn.1989) (concluding "the open-fields doctrine permits a conservation officer to enter almost any area in order to enforce the state's game and fish laws"). If Colosimo's expectation of privacy was not reasonable, the Fourth Amendment's prohibition on "unreasonable searches" is not implicated, and his conviction for refusing to allow the search should be upheld. In order for Colosimo's conviction for refusing to allow inspection of his boat to stand, we must determine whether there are any areas of the open boat where Colosimo's expectation of privacy was unreasonable. If there were areas of Colosimo's boat where an expectation of privacy was not reasonable, the conservation officer had the authority to search those areas, and Colosimo's conviction for preventing the officer from inspecting the open boat stands.

In determining whether Colosimo's expectation of privacy was reasonable, we must consider both the nature of recreational fishing and the characteristics of an open boat, as well as the fact that this request occurred in open season near a game fishing habitat. Recreational fishing is a highly regulated and licensed privilege. Those who choose to apply for this privilege accept the conditions imposed, unique to the sport of game fishing. *See* Minn.Stat. § 97A.015, subd. 25. Among those conditions is allowing conservation officers to inspect their catch and boat or other conveyance used to transport fish. Minn.Stat. § 97A.251, subd. 1(2) and (3). The Montana Supreme Court has also recognized this fact:

> In engaging in this highly regulated activity, anglers must assume the burdens of the sport as well as its benefits. Thus, no objectively reasonable expectation of privacy exists when a wildlife enforcement officer checks for hunting and fishing licenses in open season near game habitat, inquires about game taken, and requests to inspect game in the field. In this capacity, game wardens are acting not only as law enforcement officers, but as public trustees protecting and conserving Montana's wildlife and habitat for all of its citizens.

*State v. Boyer*, 308 Mont. 276, 42 P.3d 771, 776 (2002).

In *Boyer*, the Montana Supreme Court held that a fisherman had no reasonable expectation of privacy in the fish he possessed. Furthermore, a Montana Fish, Wildlife, and Parks warden was permitted to step on the transom of a fisherman's boat to inspect the catch contained in the live well of the boat. The court held that

the fisherman had no legitimate expectation of privacy that society was willing to recognize as objectively reasonable in the rear platform of the boat. The live well was open and was subject to plain view by the warden once he stepped on the boat. The Montana court held that the nature of the warden's intrusion was so minimal as not to violate any alleged privacy interest of the fisherman. *Id.* at 779.

The important role fishing plays in the lives of many Minnesotans and the corresponding need for effective regulation to protect the viability of our state's fish and game resources recently inspired an amendment to the Minnesota Constitution. The legislature proposed the amendment in the Spring of 1998. Act of April 20, 1998, ch. 392, § 1, 1998 Minn. Laws 1228. The proposed amendment was then submitted to the citizens of Minnesota, who adopted it in the 1998 general election. The amendment provides, "Hunting and fishing and the taking of game and fish are a valued part of our heritage that shall be forever preserved for the people and shall be managed by law and regulation for the public good." Minn. Const. art. XIII, sec. 12. This provision of the Minnesota Constitution must be considered in our analysis along with the extensive laws and regulations passed to manage fishing for the public good.

■ This provision of the Minnesota Constitution recognizes the link between enforcement of fishing regulations and the preservation of Minnesota's game and fish resources. We have numerous statutes relating to the taking of game in this state, and numerous regulations implemented by the Department of Natural Resources. *See* Minn.Stat. §§ 97A.011–97A.552; Minn. R. 6262.0100—6262.3300 (2001) (fishing regulations). These laws work in tandem with the constitutional mandate of Minn. Const. art. XIII, sec. 12. When

anglers purchase licenses they also routinely receive pamphlets relating to the limitations and regulations. The widespread knowledge of the restrictions accompanying the privilege of fishing casts doubt on the reasonableness of an expectation of privacy that would allow an angler to refuse inspection of his catch. Those who apply to the state for permission to harvest Minnesota's natural game are on notice that they are subject to such regulations. Colosimo, who encountered the conservation officer at Kettle Falls, a known fishing destination near the Canadian border, acknowledged not only having been fishing on Rainy Lake, a border water extending into Canada, but also admitted to transporting his catch in his open boat. Accordingly, we hold that because Colosimo had no reasonable expectation of privacy, the areas of his open boat or other conveyance used to typically store or transport fish were subject to inspection pursuant to Minn.Stat. § 97A.251, subd. 1(3).

Courts around the country have come to similar conclusions when analyzing searches of those choosing to take game. *People v. Perez,* 51 Cal.App.4th 1168, 1177, 59 Cal.Rptr.2d 596 (Cal.Ct.App.1996) ("The high degree of regulation over the privilege of hunting, in turn, reduces a hunter's reasonable expectation of privacy."); *Hamilton v. Myers,* 281 F.3d 520, 532 (6th Cir.2002) ("Everyone who participates in the privilege of hunting has a duty to permit inspections to determine whether they are complying with applicable laws."); *State v. Halverson,* 277 N.W.2d 723, 724–25 (S.D.1979) ("Since it is a privilege to hunt wild game a hunter tacitly consents to the inspection of any game animal in his possession when he makes application for and receives a hunting license.").

Our decision is consistent with our recent ruling prohibiting the search of a fish

house where the officer lacked probable cause. *State v. Larsen,* 650 N.W.2d 144 (Minn.2002). In *Larsen,* we held as follows:

> We consider the nature of the premise here—a fish house, erected and equipped to protect its occupants from the elements and often providing eating, sleeping, and other facilities—as providing privacy for activities 'recognized and permitted by society.' While clearly not a substitute for one's private dwelling, during the period of occupancy important activities of a personal nature take place. We therefore conclude appellant had a reasonable expectation of privacy in his fish house.

*Id.* at 149 (internal citation omitted).

The dissent would have us treat an open fishing boat the same as the "private fish house" from *Larsen.* We decline to do so. In stark contrast to *Larsen,* the minimal intrusion involved here is markedly less than that occurring when the privacy of the private, home-like dwelling of a fish house is invaded. Here, we are asked to conclude that an angler has a reasonable expectation of privacy in every area of his open boat, including those areas where fish are normally stored or transported. Under these facts, Colosimo did not have a legitimate expectation of privacy in certain areas of his already stopped open boat, where fish are typically stored or transported.

To conclude otherwise, that police officers require probable cause of any gaming law violation, would prevent the state from meeting its constitutional mandate that it manage and regulate fishing to preserve our natural resources. This is an undeniable fact given that the state would only be able to inspect boats when it observes or has information from a "confidential reliable informant" on the actual catching and keeping of fish in excess of the applicable limits, size, season or species. The idea that officers would be required to personally witness illegal catch activity, coupled with the reality that fishing can take hours or even days, illustrates how absurd it would be to recognize a privacy interest inherent in an angler's take and only then have probable cause to inspect. Similarly, "informants" would need first-hand knowledge of the violations, as the dissent recognizes, as mere fishing would not constitute probable cause that allows inspection. The only other option would be continued surveillance of one particular angler until a conservation officer had a basis to believe that a law was violated.

The unreasonableness of this expectation can be easily illustrated. Minnesota has specific regulations for the taking of fish on the Minnesota–Canadian boundary waters. Minn. R. 6266.0700. This allows, for example, the taking and daily possession of thirty sunfish per angler. Minn. R. 6266.0200, subd. 2(c). There were five anglers in Colosimo's fishing party. The dissent would force the game officer to have probable cause to believe that more than one hundred and fifty sunfish had been taken before an inspection can be allowed. Walleye fish have a daily possession limit of six fish in the aggregate, in general. Minn. R. 6266.0700, subd. 2(a). The dissent would restrict inspection until the officer had probable cause to believe the party had thirty-one walleye in their possession. We disagree, and again find persuasive the Montana Supreme Court's reasoning in *Boyer.* The Montana court held that:

> Montana's vast geography, the angler's somewhat uninhibited freedom of movement, and the remoteness from warrant issuing magistrates and law enforcement entities would severely impede game violation investigations. The inevitable result would be the unnecessary depletion of Montana's wildlife and fish, which

we are bound to protect and preserve. We decline to impose this burden.

*Boel,* 43 P.3d at 776.[1]

Minnesota's 10,000 lakes, along with numerous streams and rivers rival Montana's vast geography and provide anglers largely uninhibited freedom of movement in remote areas in pursuit of our abundant fish resources. In *Prouse,* Justice Blackmun wrote a concurrence joined by Justice Powell where they highlighted the clear difference between the situation in *Prouse* and that present in the sport fishing context:

> I would not regard the present case as a precedent that throws any constitutional shadow upon the necessarily somewhat individualized and perhaps largely random examinations by game wardens in the performance of their duties. In a situation of that type, it seems to me, the Court's balancing process, and the value factors under consideration, would be quite different.

*Prouse,* 440 U.S. at 659, 99 S.Ct. 1391.

## III.

Having determined that the Fourth Amendment does not prohibit a limited inspection of Colosimo's open boat, we must determine whether the statute under which Colosimo was convicted, Minn.Stat. § 97A.251, subd. 1(3), requires probable cause in order to undertake a search. The court of appeals read a probable cause

requirement into Minn.Stat. § 97A.251, subd. 1(3). The statute provides:

> A person may not:
>
> (1) intentionally hinder, resist, or obstruct an enforcement officer, agent, or employee of the division in the performance of official duties;
>
> (2) refuse to submit to inspection of firearms while in the field, licenses, or wild animals; or
>
> (3) refuse to allow inspections of a motor vehicle, boat, or other conveyance used while taking or transporting wild animals.

*Id.*

■ We review questions of statutory interpretation de novo. *Burkstrand v. Burkstrand,* 632 N.W.2d 206, 209 (Minn. 2001). The court of appeals interpreted this statute to require the state to prove, as a predicate to the crime of refusal to allow inspection, that the officer had probable cause of a violation. We disagree. The statute at issue provides a conservation officer the authority to inspect a boat or other conveyance[2] used "while taking or transporting wild animals." Minn.Stat. § 97A.215, subd. 1(3). This statute makes no mention of a requirement that the officer have probable cause in order to undertake the inspection. The court of appeals, operating under the belief that attributing meaning to the plain wording of the statute would result in the statute violating the constitution, implied a probable cause requirement in order to uphold the statute.

---

1. The intrusion here does not raise similar concerns of a "roadblock" that we addressed in *Ascher,* where a large number of motor vehicle drivers were stopped on the public highways in the hope of discovering evidence of alcohol impaired driving by some of them. *Ascher v. Comm'r of Pub. Safety,* 519 N.W.2d 183, 187 (Minn.1994). In contrast, Colosimo, whose boat was being portaged by a third party, had already come to a stop when the exchange with the conservation officer began.

The conservation officer who requested to inspect Colosimo's catch knew that Colosimo had been fishing and that he possessed game fish, and that those fish were being transported in the open boat.

2. Conveyance: "A means of carrying or transporting something." *See* Webster's International Dictionary 499 (3d ed.1993).

*State v. Colosimo,* 648 N.W.2d 271, 274 (Minn.App.2002). The court of appeals supported their interpretation by referencing Minn.Stat. § 97A.215, subd. 1(b) (2002) which provides:

When an enforcement officer has probable cause to believe that wild animals taken or possessed in violation of game and fish laws are present, the officer may:

(1) enter and inspect any place or vehicle; and

(2) open and inspect any package or container.

We decline to interject a probable cause requirement into Minn.Stat. § 97A.251 merely because the legislature in Minn. Stat. § 97A.215, subd. 1(b)(1) granted conservation officers with probable cause the authority to "enter and inspect any place or vehicle."

■ Our decision in this case does not grant conservation officers power beyond that of other law enforcement officers.[3] Rather, the difference between the inspection permitted under the facts of this case and searches impermissible under the Fourth Amendment is that fishing is a largely recreational privilege that anglers choose to engage in with knowledge of the regulations governing their conduct. Our decision merely acknowledges that an expectation of privacy in all parts of an open boat or other conveyance, admittedly used to transport fish, is not reasonable. Therefore, a limited inspection of certain parts of the open boat would not be prohibited under the Fourth Amendment.[4] As such, under the facts of this case, it was permissible for the conservation officer to conduct a lawful nonconsensual inspection of the areas of Colosimo's open boat typically used to store or transport fish. By refusing to submit to the officer's lawful request to inspect these areas of his open boat, Colosimo violated Minn.Stat. § 97A.251, subd. 1(3).

Reversed.

HANSON, J., took no part in the consideration or decision of this case.

PAGE, Justice (dissenting).

[A]s a general rule, the state, having the power to deny a privilege altogether, may grant it upon such conditions as it sees fit to impose. But the power of the state in that respect is not unlimited, and one of the limitations is that it may not impose conditions which require the relinquishment of constitutional rights. If the state may compel the surrender of one constitutional right as a condition of its favor, it may, in like manner, compel a surrender of all. It is inconceivable that guaranties embedded in the Constitution * * * may thus be manipulated out of existence.

*Frost v. Railroad Comm'n,* 271 U.S. 583, 593–94, 46 S.Ct. 605, 70 L.Ed. 1101 (1926). This means, "the state may not impose upon the permission to take wildlife the condition that the state be allowed to invade the constitutional rights of the individual." *People ex rel. Roth v. Younger,* 327 Mich. 410, 42 N.W.2d 120, 125 (1950); *see also Garrity v. New Jersey,* 385 U.S. 493, 500, 87 S.Ct. 616, 17 L.Ed.2d 562 (1967) (concluding that public employment may not be hinged on the relinquishment of the right of the individual to invoke their Fifth Amendment privilege against

---

3. Minnesota Statutes § 97A.205, which sets forth the powers of game and fish enforcement officers, provides, "Nothing in this section grants an enforcement officer any greater powers than other licensed peace officers."

4. Because Colosimo refused *any* search, we do not need to specifically delineate the limits of a legal search of an open boat.

self-incrimination); *Blackburn v. Snow*, 771 F.2d 556, 568 (1st Cir.1985) (stating that it is long settled "that government may not condition access to even a gratuitous benefit or privilege it bestows upon the sacrifice of a constitutional right").

By its decision today, the court permits precisely that which the Supreme Court in *Frost* prohibited—it grants the privilege of taking wildlife conditioned on the infringement of constitutional rights. By concluding that one who engages in the regulated activity of fishing has no expectation of privacy in the areas of an open boat or other conveyance used to typically store or transport fish,[1] the court ensures that every such search will be reasonable, even when based on a conservation officer's whim, thereby making a warrant based on probable cause unnecessary. In the end, because no such warrantless searches will be violative of the Fourth Amendment's and article I, section 10's, protections against unreasonable searches, individuals engaging in or who are believed to have engaged in hunting or fishing will be subject to searches otherwise constitutionally forbidden.

Under Minnesota law, conservation officers, as licensed peace officers, are the functional equivalent of police officers.

*See* Minn.Stat. § 626.84, subd. 1(c)(1) (2002). As such, the constitutional constraints that limit the ability of a police officer to conduct searches also apply to searches conducted by conservation officers. *See State v. Larsen*, 650 N.W.2d 144, 154 (Minn.2002) (stating that "conservation officers are subject to the same constitutional constraints as other law enforcement officers in the performance of their duties," therefore, any restrictions this court has found applicable to police officers also apply to conservation officers); Minn.Stat. § 626.05, subd. 2 (2002).

Individuals have the right to be free from unreasonable searches under both the United States and Minnesota Constitutions.[2] U.S. Const. Amend. IV; Minn. Const. Art. 1, § 10. This right "protects people, and not places," by protecting what an individual seeks "to preserve as private, even in an area accessible to the public." *Katz v. United States*, 389 U.S. 347, 351, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967). In order for a person to receive constitutional protection, (1) the search must be of an area in which the individual has an expectation of privacy and (2) the individual's expectation of privacy must be one that is recognized within society as reasonable.

---

1. While the court's opinion refers to the expectation of privacy in the areas of an open boat or other conveyance used to typically store or transport fish, it does not define or explain what constitutes these areas. Presumably, the court is referring to packages or containers that are present on the boat. Also, presumably, the court fails to define or explain what constitutes these areas because it wants to avoid the probable cause requirements of Minn.Stat. § 97A.215, subd. 1b(2). The expansive language in the opinion makes it apparent that a peace officer, whether a police officer or a conservation officer, will be able to search not only open boats, but any boat, car, or truck on the mere hunch that the occupants have engaged in the regulated activity of hunting or fishing.

2. When interpreting a provision of the Minnesota Constitution that contains nearly identical language to a provision in the United States Constitution, decisions from the United States Supreme Court discussing that constitutional provision are "inherently persuasive, although not necessarily compelling." *State v. Wiegand*, 645 N.W.2d 125, 132 (Minn. 2002). However, our constitution may not provide an individual with less protection than the United States Constitution, *Coolidge v. New. Hampshire*, 403 U.S. 443, 453, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971), although we may construe our constitution to extend greater protections than a comparable provision of the United States Constitution. *Wiegand*, 645 N.W.2d at 132; *State v. Carter*, 596 N.W.2d 654, 656–57 (Minn.1999).

See *Bond v. United States,* 529 U.S. 334, 338, 120 S.Ct. 1462, 146 L.Ed.2d 365 (2000). Generally, searches conducted without prior approval of a magistrate or judge are per se unreasonable, unless they fall within a judicially-recognized exception. *See Coolidge v. New Hampshire,* 403 U.S. 443, 454–55, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971).

While courts have recognized that the privacy expectation in a moving vehicle, including a boat, is less than that of a home, this does not mean that the Fourth Amendment fails to provide any protection. *See Carroll v. United States,* 267 U.S. 132, 153, 45 S.Ct. 280, 69 L.Ed. 543 (1924) (recognizing that, while the search of a "ship, motor boat, wagon, or automobile" is necessarily different from a search of a "store, dwelling house, or other structure" under the Fourth Amendment, the protections guaranteed in the Fourth Amendment still apply); *United States v. Ross,* 456 U.S. 798, 805–06, 102 S.Ct. 2157, 72 L.Ed.2d 572 (1982) (recognizing that Fourth Amendment applies to vessels as well as cars); *Cardwell v. Lewis,* 417 U.S. 583, 590–91, 94 S.Ct. 2464, 41 L.Ed.2d 325 (1974) (noting that, while occupants and their belongings are in plain view and exposed to the public eye and therefore are not protected under the Fourth Amendment, this does not mean that no part of the interior of a motor vehicle is protected or that an individual's right to be free from unreasonable searches and seizures is waived); *see also United States v. Lauchli,* 724 F.2d 1279, 1282 (11th Cir.1984) (applying the vehicle exception to a boat to determine whether the warrantless search was appropriate under the Fourth Amendment); *United States v. Whitaker,* 592 F.2d 826, 828 n. 2 (5th Cir.1979) (recognizing that the Fourth Amendment has long been considered applicable to boats and that there exists an expectation of privacy in a vessel). As we recognized in *State v.*

*Wiegand,* 645 N.W.2d 125 (Minn.2002), " '[a] search, even of [a vehicle], is a substantial invasion of privacy,' " to which Fourth Amendment protections apply. *Id.* at 131 (quoting *United States v. Ortiz,* 422 U.S. 891, 896, 95 S.Ct. 2585, 45 L.Ed.2d 623 (1975)). Because individuals have a diminished expectation of privacy in their vehicles, courts have created and applied an exception to permit warrantless searches so long as the search was "reasonable." *California v. Carney,* 471 U.S. 386, 392–94, 105 S.Ct. 2066, 85 L.Ed.2d 406 (1985).

In the context of fishing and hunting, a search is "reasonable" when the conservation officer has probable cause to search arising from a belief that the individual to be searched is engaged in or has very recently engaged in either hunting or fishing *and* that a violation of the fishing or hunting laws may have occurred. *See Younger,* 42 N.W.2d at 122 (stating that probable cause based on the belief that a lawful act, like fishing or hunting, has been, is being, or in the future will be committed has never rendered a search reasonable under the constitution, and therefore concluding that "probable cause" requires knowledge or belief of an unlawful act). Without such probable cause restrictions, individuals will be subject to searches based on the conservation officer's whim rather than based on actual suspicion that the individual has engaged in conduct that may have violated the state's fishing and hunting laws. *See State v. Henning,* 666 N.W.2d 379, 385 (Minn. 2003) (stating that peace officers "should not be allowed to define the reasonableness of their own conduct"); *Delaware v. Prouse,* 440 U.S. 648, 661, 99 S.Ct. 1391, 59 L.Ed.2d 660 (1979) (stating that when an official lacks either probable cause to believe that a violation has occurred or other articulable basis upon which a reasonable suspicion may be based before effectuating

a search or seizure "[t]his kind of standardless and unconstrained discretion is the evil the Court has discerned when in previous cases it has insisted that the discretion of the official in the field be circumscribed, at least to some extent"); *Brinegar v. United States*, 338 U.S. 160, 180, 69 S.Ct. 1302, 93 L.Ed. 1879 (1949) (Jackson, J., dissenting), *quoted in Ascher v. Comm'r of Public Safety*, 519 N.W.2d 183, 186 n. 1 (Minn.1994) (stating that "[u]ncontrolled search and seizure is one of the first and most effective arsenal of every arbitrary government"); *see also Ortiz*, 422 U.S. at 896, 95 S.Ct. 2585 (finding that a search is a "substantial invasion of privacy" and, therefore, to protect individual's right to be free from "official arbitrariness," those effectuating the search must have probable cause).

The historic protection of an individual's right to be free from unreasonable searches has been effectively eliminated by today's decision. The court concludes that Colosimo had no reasonable expectation of privacy in areas of his open boat used to transport or store fish[3] because of the extensiveness of state regulation of fishing and hunting activities and because recreational fishing is a privilege. That is a rationale this court firmly rejected in *Larsen* less than a year ago.[4]

---

**3.** Obviously, to the extent that the boat is open and items are in plain view, there is no reasonable expectation of privacy in those items because the individual has not sought to keep them private. The problem is that the court extends this rationale to any place on the boat where fish are typically stored and to items not in plain view. However, the test is whether there are areas in the boat that the individual has sought to keep private, even though the area might otherwise be accessible to the public. *See Katz*, 389 U.S. at 351, 88 S.Ct. 507; *see also Cardwell*, 417 U.S. at 590–91, 94 S.Ct. 2464 (noting that, while occupants and their belongings are in plain view and exposed to the public eye and therefore are not protected under the Fourth Amendment, this does not mean that no part of the interior of a motor vehicle is protected or that an individual's right to be free from unreasonable searches and seizures is waived).

In failing to define "areas of an open boat or other conveyance used to typically store or transport fish," the court has opened the door to searches of packages and containers present on a boat which are likely to have items that an individual is seeking to keep private. *See Ross*, 456 U.S. at 822–23, 102 S.Ct. 2157 (concluding that "the Fourth Amendment provides protection to the owner of every container that conceals its contents from plain view" unless one of the well-established exceptions apply).

If such containers may be searched without probable cause, what about the same containers found on an enclosed boat when the enclosed boat's occupants are suspected of having been fishing? Whether the boat is open or closed cannot be the determining factor. Moreover, under the court's reasoning, there is no basis for treating them differently.

**4.** The court relies on four cases to support this conclusion. That reliance is misplaced. The first case, *State v. Boyer*, 308 Mont. 276, 42 P.3d 771 (2002), involved a conservation officer who stepped on the transom of a fishing boat, looked into an already opened live well, and discovered a violation of Montana's fishing regulations. *Id.* at 779. The question before the Montana Supreme Court did not turn on the conservation officer's search because the violation was in the officer's plain view and did not require the officer to "conduct a search of the boat, look under the seats, remove or rearrange any personal belongings, or even open the top of the live well." *Id.* (distinguishing a search that required opening the vehicle's door and conducting a search of the interior from just looking in a live well that was already open).

In this case, the conservation officer testified that he could not determine from what he could see on the boat that the party had been fishing or that they had engaged in any violations of the fishing laws. Because all of Colosimo's belongings were packed, for the conservation officer to inspect Colosimo's catch, personal belongings would have needed to be rearranged, and coolers or live wells would have had to be opened, all actions that the *Boyer* court indicated would have required probable cause to conduct a search.

In *Larsen*, we recognized that this state's fish and game rules and regulations were no more pervasive or comprehensive than the state's traffic rules and regulations. *Id.* at 153. We noted that the state's interest in protecting and regulating wildlife was less than its interest in deterring drunk driving, which we have concluded does not outweigh the privacy expectations of a motor vehicle occupant. *Id.* (*relying on Ascher*, 519 N.W.2d 183). If, in the face of extensive regulation, the search of a motor vehicle may "not be initiated without at least a reasonable articulable suspicion of unlawful conduct," *Larsen*, 650 N.W.2d at 153, then the search of a fishing boat should not be treated any differently. As we noted recently, "[w]e have never before simply allowed the ends to justify the means when the means void our citizens' constitutional protections." *See Henning*, 666 N.W.2d at 386.

Today's decision effectively overturns *Larsen*. In doing so, the court implicitly concludes that the state's interest in protecting and regulating its wildlife resource is more important than its interest in protecting human life by deterring drunk driving. *See Ascher*, 519 N.W.2d at 186–87 (recognizing that, although a substantial portion of the society would agree that a sobriety checkpoint was a permissible way to eliminate drunk driving, suspicionless stops still violated our constitutional requirements even though the searches were only minimally intrusive). In its breadth, the court's decision appears to go so far as to permit any peace officer to search any vehicle based on the officer's mere suspicion that the occupants have engaged in the regulated activity of hunting or fishing. This decision turns our court's search and seizure law on its head.

The result is that individuals may be stopped on numerous occasions without a reasonable suspicion of any criminal activity merely because a conservation officer believes that the individuals have been engaged in the regulated activities of hunting or fishing. The court's interpretation "eliminate[s] the constitutional safeguard requiring an officer to have reasonable articulable suspicion of criminal activity before stopping [an individual], but provides no substitute to protect [individuals who appear to have engaged in the regulated activity] from repeated stops at the unchecked discretion of [peace] officers." *Henning*, 666 N.W.2d at 385; *see Prouse*, 440 U.S. at 660, 99 S.Ct. 1391 ("To insist neither upon an appropriate factual basis for suspicion directed at a particular [motor vehicle] nor upon some other substantial and objective standard or rule to govern the exercise of discretion 'would invite intrusions upon constitutionally guaran-

---

The court's reliance on *People v. Perez*, 51 Cal.App.4th 1168, 59 Cal.Rptr.2d 596 (Cal.Ct. App.1996), and *State v. Halverson*, 277 N.W.2d 723 (S.D.1979), is also misplaced as support because these two cases involved searches that arose out of the use of fish and game checkpoints, which are impermissible under the Minnesota Constitution. *See Ascher*, 519 N.W.2d at 187 (concluding that sobriety checkpoints violate the Minnesota Constitution, which requires the police to have an objective individualized articulable suspicion of criminal wrongdoing before subjecting a driver to an investigative stop). The final case, *Hamilton v. Myers*, 281 F.3d 520 (6th Cir.2002), justified a warrantless search and seizure based on the idea that fishing and hunting are regulated activities, a concept that, as noted, this court soundly rejected in *Larsen*. *Larsen*, 650 N.W.2d at 152–53 (concluding that fishing is not comparable to "running an automobile junkyard business, operating a licensed gun dealership, or engaging in the sale of alcoholic beverages for the purpose of the closely regulated industry exception"). As none of these cases provide any legal support under Minnesota law, I can only conclude that the court's decision is based on the exercise of its will.

teed rights based on nothing more substantial than inarticulate hunches.' ") (citation omitted).

The court attempts to justify its result by relying on the concurrence in *Prouse*, which states in part, "I would not regard the present case as a precedent that

throws any constitutional shadow upon the necessarily somewhat individualized and perhaps largely random examinations by game wardens in their performance of their duties." *Prouse*, 440 U.S. at 664, 99 S.Ct. 1391 (Blackman, J., concurring). However, in its desire to find some case to support its untenable position,[5] the court

**5.** As noted previously, *Boyer* did not answer the question of whether the search of a fishing boat for fishing and gaming violations would require probable cause because the Montana Supreme Court found that there was a reasonable suspicion to effectuate the stop and that once stopped the fishing violations were in plain view, thus no search was required. 42 P.3d at 778–79. *Boyer* is not the only court to require either some objective, articulable basis upon which to justify violating an individual's right to privacy or a "neutral criteria" to constrain the officer's unbridled discretion. *See Prouse*, 440 U.S. at 662, 99 S.Ct. 1391. Rather, a review of case law across the country reveals that this court's decision allowing searches and seizures to be conducted based on an officer's whim is contrary to the majority of cases deciding whether a conservation officer's search or seizure of an individual violates constitutional protections. *See United States v. Munoz*, 701 F.2d 1293, 1300–01 (9th. Cir.1983) (concluding that roving stops by conservation officers to check for compliance with hunting regulations without any founded suspicion violates an individual's Fourth Amendment rights to be free from unreasonable searches and seizures); *People v. Coca*, 829 P.2d 385, 387 (Colo.1992) (stating that when the conservation officers had no reason to believe that the vehicle had been involved in hunting or was in violation of the state's wildlife laws "[t]he conduct in question parallels that condemned in *Delaware v. Prouse*, 440 U.S. 648, 99 S.Ct. 1391, 59 L.Ed.2d 660 (1979), in that the * * * vehicle was stopped merely to see if it had been involved in the commission of a hunting infraction. Nothing that was known by the wildlife officers provided them with a reason to believe that a violation of the wildlife laws was occurring, had occurred, or was about to occur."); *Hill v. State*, 238 So.2d 608, 611 (Fla.1970) (stating that the authority to search a boat for violations of the conservation laws is bound by the requirement that the conservation officer have probable cause to believe

that a conversation law violation has occurred); *People v. Levens*, 306 Ill.App.3d 230, 239 Ill.Dec. 425, 713 N.E.2d 1275, 1277–78 (1999) ("[A] conservation officer may not stop a motorist if the officer merely believes that the motorist is currently or was very recently engaged in lawful hunting. Because a traffic stop is a greater intrusion than a brief detention in the field, we require that an officer must reasonably believe that a motorist's hunting is illegal before the officer may make a valid stop." 'Reason to believe' is probable cause to search which arises from indicia that the person is a hunter who is immediately or was very recently engaged in hunting."); *State v. Keehner*, 425 N.W.2d 41, 45 (Iowa 1988) (upholding a stop to check for hunting licenses because the stop was designed "not to commit the seizure to the unfettered discretion of the officer: In order to be stopped, the individual must first be engaged in an activity which may be reasonably interpreted as 'hunting.' "); *Drane v. State*, 493 So.2d 294, 297–98 (Miss.1986) (allowing the use of roadblocks or checkpoint stops in game areas to stop individuals as part of scheme to manage wildlife resources, but requiring the conservation officer to have probable cause to believe that a violation of the hunting and gaming laws has occurred before a search of the contents of a boat, car, or other vehicle may be conducted); *State v. Creech*, 111 N.M. 490, 806 P.2d 1080, 1083 (Ct.App.1991) (noting that, while the concurrence in *Prouse* discussed a potentially different standard for conservation officers conducting random stops, so long as reasonable suspicion is not present "the stop must 'be carried out pursuant to a plan embodying explicit, neutral limitations on the conduct of individual officers' ") (quoting *Brown v. Texas*, 443 U.S. 47, 51, 99 S.Ct. 2637, 61 L.Ed.2d 357 (1979)); *State v. Tourtillott*, 289 Or. 845, 618 P.2d 423, 430 (1980) (upholding a wildlife roadblock stop because "[t]here was no exercise of discretion in the sense that the policeman would pull over any vehicle based upon a 'hunch' ");

ignores the clear language in the *Prouse* majority: "There are certain 'relatively unique circumstances' in which consent to regulatory restrictions is presumptively concurrent with participation in the regulated enterprise. *Otherwise regulatory inspections unaccompanied by any quantum of individualized articulable suspicion must be undertaken pursuant to previously specified 'neutral criteria.'*" *Prouse*, 440 U.S. at 662, 99 S.Ct. 1391 (citation omitted) (emphasis added). This language makes clear that the Court is drawing a distinction between those regulated industries for which the "closely regulated industry exception" is applicable and every other regulated activity, like driving, for which "some quantum of individualized suspicion" is required to ensure that an individual's reasonable expectation of privacy is protected. *See id.* at 654–55, 99 S.Ct. 1391. Because, in Minnesota, this court has explicitly excluded recreational fishing from the "closely regulated industry exception" to probable cause requirements, the result is clear. *See Larsen*, 650 N.W.2d at 152–53 ("We do not perceive recreational * * * fishing * * * comparable to running an automobile junkyard business, operating a licensed gun dealership, or engaging in the sale of alcoholic beverages for purposes of the closely regulated industry exception."). Gaming and fishing "regulatory inspections unaccompanied by any quantum of individualized articulable suspicion must be undertaken pursuant to previously

specified 'neutral criteria.'" *Prouse*, 440 U.S. at 662, 99 S.Ct. 1391; *Brown v. Texas*, 443 U.S. 47, 51, 99 S.Ct. 2637, 61 L.Ed.2d 357 (1979) ("[T]he Fourth Amendment requires that a seizure must be based on specific, objective facts indicating that society's legitimate interests require the seizure of the particular individual, or that the seizure must be carried out pursuant to a plan embodying explicit neutral limitations on the conduct of individual officers."). Because in this case the conservation officer did not follow any "previously specified 'neutral criteria,'" but was merely acting on his "inarticulable hunch," any resulting search would violate the constitution.

The presence of extensive regulations does not, as the court concludes, result in the elimination of an expectation of privacy. *See Prouse*, 440 U.S. at 662, 99 S.Ct. 1391 ("The 'grave danger' of abuse of discretion does not disappear simply because the automobile is subject to state regulation resulting in numerous instances of police-citizen contact * * * 'if the government intrudes * * * the privacy interest suffers whether the government's motivation is to investigate violations of criminal laws or breaches of other statutory or regulatory standards.'") (citations omitted). At most, it is one ground for deciding whether the vehicle exception to the Fourth Amendment is applicable to boats. *See Carney*, 471 U.S. at 394, 105 S.Ct. 2066 (concluding that vehicles have a reduced expectation of privacy warranting the vehi-

*Hughes v. State*, 195 Tenn. 290, 259 S.W.2d 527, 528 (1953) (holding that, while a search and inspection may be done without a warrant, this power does not mean that a search may be conducted at *"at any time or place* after the privilege has been exercised, such as searching the premises and person of the accused days after the hunt is over"); *State v. Legg*, 207 W.Va. 686, 536 S.E.2d 110, 117 (2000) (concluding that random stops by conservation officers to search for violations of

hunting laws without an articulable, reasonable suspicion constitutes "[s]uch unbridled use of authority by a law enforcement officer [which] is precisely what the State and Federal constitutions are intended to prohibit"); *State v. Flanagan*, 251 Wis. 517, 29 N.W.2d 771, 773 (1947) (upholding a search and seizure by a conservation officer who had probable cause to believe that a violation of the gaming laws had occurred).

cle exception because they are readily mobile and because of the pervasive regulations governing their use). Indeed, even if the vehicle exception is applicable to boats, and I believe it is, a warrantless search of a fishing boat still needs to be based on probable cause before a search may be upheld. *Id.* at 392, 105 S.Ct. 2066 (concluding that, when "pervasive schemes of regulation, which necessarily lead to reduced expectations of privacy, and the exigencies attendant to ready mobility justify searches without prior recourse to the authority of a magistrate *so long as the overriding standard of probable cause is met*") (emphasis added).

Requiring a conservation officer to have probable cause before conducting a warrantless search of a boat is consistent with the statutory scheme governing the conduct of conservation officers in the field. The legislature does not have the power to "redefine the constitutional parameters of [peace officer] conduct," and this court has no authority to ignore clear and unambiguous legislative pronouncements when trying to ascertain the intent of the legislature. *Henning*, 666 N.W.2d at 385. The presumption is that the legislature did not intend an absurd or unreasonable result and that the legislature intends the entire statute to be effective and certain. Minn. Stat. § 645.17 (2002). Here, Minnesota Statutes § 97A.215, subdivision 1b (2002), provides that a conservation officer must have probable cause to believe that wild animals were taken or possessed in violation of the game and fish laws before he or she is authorized to conduct an inspection of a vehicle, package, or container that may contain game or fish. Minnesota Statutes § 97A.251 (2002) describes those actions that are prohibited by a licensee and specifies those that will be criminal violations and those that are subject to civil action. It does not, contrary to the court's reading, grant a conservation officer authority to conduct an inspection of a vehicle merely upon the officer's belief that the licensee has engaged in fishing or hunting. Rather, the "inspection" referenced in Minn.Stat. § 97A.251, subd. 1(3), is the inspection authorized under Minn. Stat. § 97A.215, subd. 1b. To read these statutes in the way the court does produces an absurd result. On one hand, the enforcement officer cannot conduct an inspection without probable cause; on the other hand, a person can be criminally penalized for refusing to allow an inspection that the enforcement officer has no statutory authority to conduct in the first instance.

To the extent that the "inspection" referenced in section 97A.251, subdivision 1(3), is not the "inspection" authorized under section 97A.215, subdivision 1b, the court's expansion of the scope of the inspection to include "areas of an open boat or other conveyance used to typically store or transport fish" goes well beyond that permitted by the express language of section 97A.251, subdivision 1(3). Subdivision 1(3) of section 97A.251 makes it unlawful for a person to "refuse to allow inspection of a *motor vehicle, boat, or other conveyance* used while taking or transporting wild animals" (emphasis added). The statute does not contain any language authorizing the "inspection" of packages or containers. Thus, the plain language of the statute does not make it unlawful to refuse to allow an inspection of such packages or containers. If the legislature intended for it to be unlawful for a person to refuse to allow inspection of packages or containers found on a boat, it clearly knew how to and could have done so by using the language of section 97A.215, subdivision 1b. The legislature, however, did not. Here, there is no evidence in the record that supports a conclusion that probable cause existed; all the evidence shows that the conserva-

tion officer searched Colosimo's boat on a whim.[6] *See In re Welfare of D.A.G.*, 484 N.W.2d 787, 792 (Minn.1992) ("Although there are situations where we must entrust the police * * * and allow them to conduct a warrantless search, they cannot assume this role in every instance or at their own whim.").

While a probable cause requirement might make fishing violations more difficult to detect, as we concluded in *Larsen*, the "ease in enforcing the law has never been a sufficient justification for government intrusion." 650 N.W.2d at 150 n. 5. The court claims that requiring probable cause in order to search a boat "would prevent the state from meeting its constitutional mandate that it manage and regulate fishing to preserve our natural resources." However, the state offered no evidence to show that this was the only effective enforcement measure and in fact conceded that requiring conservation officers to comply with the constitutional requirements of probable cause "[d]oes not pose any kind of direct threat to fish, per

se. The resource itself can be protected even if individual harvest behaviors cannot be regulated." Without empirical evidence to the contrary, there is no way to reach the conclusion that the random seizure of an individual on the mere belief that the individual has engaged in either fishing or gaming is at all an effective means of promoting resource preservation. *See Prouse*, 440 U.S. at 661, 99 S.Ct. 1391 (requiring more than a "marginal contribution" to prevent the violation to justify subjecting individuals to seizures based on an officer's whim). As the Court stated in *Prouse*, "Given the alternative mechanisms available, both those in use and those that might be adopted, we are unconvinced that the incremental contribution to [gaming and fishing resource management] justifies the practice under the Fourth Amendment." 440 U.S. at 659, 99 S.Ct. 1391.

Rather than requiring the state to properly manage Minnesota's wildlife resources, the court has instead decided to grant the state the power to compel the relinquishment of an individual's constitu-

---

**6.** The conservation officer admitted that he had no reason to suspect or believe that Colosimo was engaged in conduct that had violated the fishing and hunting laws or that he had contraband in his vehicle. There were no visual signs, in terms of fishing poles, coolers, or other fishing gear, which would indicate that Colosimo's party had been fishing that day or any other. According to the conservation officer, the only reason he approached Colosimo's boat was because five men were sitting in a boat, which led him to conclude that they were a fishing party. As the opinion authored by Justice Gilbert so aptly recognized in *Henning*, it is a violation of our constitution for officers to seize individuals based on their "unchecked discretion," even when only a small number of individuals are affected and even when the state has given these individuals permission to engage in the regulated activity. Here, the officer acknowledged that had there been children or women in Colosimo's boat he would not have approached the boat, let alone seized its passen-

gers. It is this type of constitutional infringement that this court has sought to prevent in *Ascher, Henning,* and *Larsen,* yet in this case the court is willing to ignore those same constitutional protections.

The court attempts to justify its decision further by relying on the conservation officer's knowledge after he approached Colosimo's boat. However, Colosimo's responses to the conservation officer's questions did not create probable cause or even reasonable suspicion of criminal activity justifying the conservation officer's request that he be able to search the boat. All that was elicited was that Colosimo was engaged in lawful conduct before being approached by the conservation officer, which is not enough to warrant a search. *See State v. Harris*, 265 Minn. 260, 268, 121 N.W.2d 327, 333 (1963) (concluding that "[s]earches which are 'exploratory and general and made solely to find evidence of * * * guilt' are invalid" when there is no indication that a crime has been or is about to be committed) (citations omitted).

tional right not only to be free from unreasonable searches, but also the freedom to assert one's constitutional right without fear of criminal punishment. By allowing Colosimo's passive refusal to consent to the search of his boat to be used as the basis for establishing one of the necessary elements to prove a violation of Minn.Stat. § 97A.251, subd. 1, the court renders section 97A.251, subdivision 1, unconstitutional and Colosimo's conviction invalid. *See District of Columbia v. Little,* 339 U.S. 1, 7, 70 S.Ct. 468, 94 L.Ed. 599 (1950) (concluding that under no circumstances is passive refusal to consent to a search ever to be treated as evidence of a crime); *United States v. Prescott,* 581 F.2d 1343, 1351 (9th Cir.1978) (stating that "[o]ne cannot be penalized for asserting this right, regardless of one's motivation. Just as a criminal suspect may validly invoke his Fifth Amendment privilege in an effort to shield himself from liability, so may one withhold consent to a warrantless search, even though one's purpose be to conceal evidence of wrongdoing.") (citations omitted); *United States v. Alexander,* 835 F.2d 1406, 1409 n. 3 (11th Cir.1988) (concluding that a defendant's refusal to consent to a search cannot establish probable cause upon which to obtain a warrant to conduct the search). "If the government [can] use such a refusal against the citizen, an unfair and impermissible burden would be placed upon the assertion of a constitutional right and future consents would not be 'freely and voluntarily given.'" *Prescott,* 581 F.2d at 1351 (citation omitted).

In upholding Colosimo's conviction, the court forces individuals to choose between waiving their constitutional right to be free from unreasonable searches in exchange for the "privilege" of hunting, fishing, trapping, or possessing wildlife. If an individual consents to a conservation officer's requested search, that individual waives the ability to later object to the search. *See*

*State v. Harris,* 265 Minn. 260, 269, 121 N.W.2d 327, 334 (1963). If the individual objects to the search, then under the court's interpretation, irrespective of whether the sought-after search would violate the Fourth Amendment, that individual has violated Minn.Stat. § 97A.251 and may be charged with a criminal offense. *See* Minn.Stat. § 97A.251.

Today's sweeping decision holding that there is no expectation of privacy in areas of an open boat where fish are typically stored overturns recent precedent and eviscerates the constitutional protection against unreasonable searches. Because both conservation officers and police officers are bound as peace officers by the same constitutional constraints, the court's decision has now opened the door for warrantless searches by any peace officer upon the mere suspicion that an individual is, has been, or will in the future engage in hunting or fishing. As the Court said in *Frost,* "It is inconceivable that guaranties embedded in the Constitution * * * may thus be manipulated out of existence." 271 U.S. at 593–94, 46 S.Ct. 605.

Therefore, I respectfully dissent.

ANDERSON, PAUL H., Justice (concurring in part and dissenting in part).

I concur in part and dissent in part. I concur in the majority's conclusion that Officer Steen had the right to inspect the open sections of Colosimo's fishing boat and that Colosimo prevented Steen from doing so; therefore, Steen was justified in issuing Colosimo a citation for violating Minn.Stat. § 97A.251, subd. 1(3). But, unlike the majority, I would end the analysis at this point. The majority goes beyond what is necessary to decide this case when it holds that Steen had the right to inspect any "other conveyance" used by Colosimo to transport fish.

While the record is unclear as to why and how Colosimo's boat came to a stop at the portage, once it did stop, Steen engaged in conversation with Colosimo, and Colosimo admitted to Steen that his party had been fishing and that the party had fish on board the boat. While the accounts vary as to exactly how Steen then phrased his request to inspect Colosimo's boat, it is undisputed that Steen made numerous requests, all of which Colosimo adamantly refused. Accounts of the demeanor of the parties also vary, but one or the other or both of the men were concerned enough about any escalation in the standoff such that Steen, without making any attempt to look in the open sections of the boat, issued Colosimo a citation for violating Minn.Stat. § 97A.251, subd. 1(3). Colosimo then accepted the citation without further ado.

As a fisherman in an open boat who admitted he had been fishing, Colosimo had no reasonable expectation of privacy to the open sections of his boat even though having an officer look into those sections of the boat is intrusive to some degree. Colosimo improperly refused and hindered Steen when he prevented Steen from conducting an inspection of the open sections of the boat. Accordingly, Colosimo violated Minnesota law, and his conviction by the district court should be affirmed.

Affirming Colosimo's conviction on this basis is sufficient to resolve the case before us. Nevertheless, the majority expands its holding to include any "other conveyance" used to transport fish. This overly broad holding is both unnecessary and inadvisable. Steen was prevented from getting anywhere close to an attempt to search any "other conveyance" used by Colosimo to transport fish, and we do not know what other conveyance, if any, Steen sought to inspect. In the context of the case we have before us today, it is difficult to ascertain with any degree of certainty what other conveyances are subject to a search. Therefore, we should leave to another day the resolution of the question of what right, if any, a conservation officer has to inspect more than the open sections of a fisherman's boat.