

# ARKANSAS COURT OF APPEALS

DIVISIONS I, II & IV

No. CR–14–210

| | | |
|---|---|---|
| | | **Opinion Delivered** December 17, 2014 |
| JIMMY PAUL PICKLE | | APPEAL FROM THE CRAIGHEAD |
| | APPELLANT | COUNTY CIRCUIT COURT, |
| | | WESTERN DISTRICT |
| | | [No. CR-2013-115] |
| V. | | |
| | | HONORABLE CINDY THYER, JUDGE |
| STATE OF ARKANSAS | | |
| | APPELLEE | REVERSED and REMANDED |

## LARRY D. VAUGHT, Judge

Jimmy Paul Pickle appeals from the Craighead County Circuit Court's denial of his motion to suppress evidence obtained when two Arkansas Game and Fish officers ("game wardens") conducted a warrantless, suspicionless hunting-compliance check on Pickle's duck-hunting party. Pickle argues that the game wardens unlawfully detained and unlawfully searched him. The State argues that (1) there was no seizure implicating the Fourth Amendment, (2) Pickle had no reasonable expectation of privacy under the open-fields doctrine, and (3) Pickle had no reasonable expectation of privacy as to his identity. Alternatively, the State argues that reasonable suspicion is not required in order for game wardens to conduct routine hunting-compliance checks. The Arkansas Game and Fish Commission has also filed an amicus curiae brief arguing that warrantless, suspicionless hunting-compliance checks are necessary tools for game wardens, who would not otherwise be able to enforce state and federal regulations.



We disagree with the State's first three arguments. This case involves a seizure implicating the protections of the Fourth Amendment; the open-fields doctrine does not apply, and there is no legal authority exempting identity from the protections of the Fourth Amendment. As for whether reasonable suspicion is required for routine hunting-compliance checks, controlling precedent mandates that, in the absence of reasonable suspicion, law-enforcement activity must be governed by a plan of explicit, neutral limitations that prevent game wardens from exercising unbridled discretion. Because the circuit court's order is silent on this key element, we reverse and remand.

## I. *Facts*

At the suppression hearing, the facts revealed that on November 18, 2012, Pickle, a friend, and the friend's minor son were duck hunting on an oxbow lake along the Cache River in Craighead County, Arkansas. There is no dispute that the party was hunting in an allowed location, during duck season, and within permissible hunting hours. Two game wardens, Jeff McMullin and Brian Aston, were assigned to the area, patrolling for potential hunting violations. The game wardens testified that they observed Pickle's hunting party for approximately two hours, but saw nothing to indicate any violations of law. They then made contact with Pickle and his fellow hunters in order to perform a routine hunting-compliance check, which involved verification of hunting licenses and searches for and examination of firearms, ammunition, and game. Pickle and his two companions were not actively hunting at the time; they were cooking breakfast at a campsite, with their firearms resting against nearby trees. The game wardens approached the group, identified themselves, and demanded to see the hunters' licenses. Pickle

SLIP OPINION

identified himself and told the game wardens that he had a valid license but that he had left it in his truck. The game wardens then picked up and examined each gun in turn, asking the group to identify the owner of each firearm. Pickle identified one of the guns as belonging to him, and it was found to be in compliance with all relevant regulations. As part of the routine hunting-compliance check, the game wardens also searched the group for ammunition or game that violated state of federal law. Pickle's friend was issued a citation for a firearm violation. The minor child was given a warning about an ammunition violation.

Because Pickle indicated that he had a valid hunting license but did not have it on his person, the game wardens then retreated a short distance and called dispatch in Little Rock to verify his license. The game wardens first ran a 10-26 Hunting and Fishing License check, which confirmed that Pickle did have a valid license. They then ran a 10-51 outstanding-warrants check, which revealed that Pickle was a convicted felon. The game wardens returned to the hunting party, arrested Pickle for being a felon in possession of a firearm, and conducted a search incident to arrest, which revealed a small amount of methamphetamine and a glass pipe used for smoking methamphetamine. Pickle was charged with felon in possession of a firearm, possession of a controlled substance, and possession of drug paraphernalia.

In a motion to suppress and subsequent hearing, Pickle argued that the game wardens violated his rights under the Fourth Amendment to the United States Constitution and article 2, section 15, of the Arkansas Constitution by unlawfully detaining him and unlawfully searching him without reasonable suspicion. The circuit court took the issue under advisement and issued an order on September 9, 2013, denying the motion to suppress. Pickle then entered a



conditional guilty plea, preserving his right to appeal the denial of the motion to suppress, and the circuit court accepted the plea. The circuit court placed Pickle on sixty months' probation and ordered him to pay fines and costs. Pickle filed a timely notice of appeal.

## II. *Standard of Review*

The proponent of a motion to suppress evidence bears the burden of demonstrating the basis for suppression. *Norman v. State*, 326 Ark. 210, 214, 931 S.W.2d 96, 99 (1996). In reviewing the denial of a motion to suppress evidence in a criminal proceeding, we make an independent examination based on the totality of the circumstances, reviewing findings of historical fact for clear error and determining whether those facts give rise to reasonable suspicion or probable cause. *Yarbrough v. State*, 370 Ark. 31, 36, 257 S.W.3d 50, 55 (2007). We give due weight to inferences drawn by the circuit court and deference to the circuit court's findings, and we will reverse the circuit court only if the denial of the motion to suppress was clearly against a preponderance of the evidence. *Id.*, 257 S.W.3d at 55. Moreover, we defer to the circuit court in assessing the credibility of witnesses. *Bogard v. State*, 88 Ark. App. 214, 219, 197 S.W.3d 1, 3 (2004).

## III. *Discussion*

Pickle argues that he was unlawfully detained and unlawfully searched, in violation of his rights under the Fourth Amendment to the United States Constitution and article 2, section 15 of the Arkansas Constitution because the game wardens had neither a warrant nor a reasonable suspicion of any violation of law. Both constitutional provisions provide essentially identical protection from unreasonable and arbitrary seizures and searches. Additionally, the Arkansas

Rules of Criminal Procedure restrict law enforcement's ability to detain or search members of the public. *See, e.g.*, Ark. R. Crim. P. 2.2 & 3.1 (2014). There is no dispute that Arkansas Game and Fish officers are certified law enforcement officers. There is also no dispute that the game wardens in this case lacked any reasonable suspicion that Pickle or his companions were engaged in criminal conduct. The issue presented on appeal is whether game wardens are subject to the same constitutional restrictions as traditional law-enforcement officers. However, before reaching that question, we must first address three preliminary arguments presented by the State as to why the protections of the Fourth Amendment are not implicated in this case.

First, we hold that the game wardens' initial contact with Pickle, during which he identified himself and identified his gun, was a seizure implicating the protections of the Fourth Amendment or article 2, section 15. "A 'seizure' occurs when the officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen." *Thompson v. State*, 303 Ark. 407, 409, 797 S.W.2d 450, 451 (1990). The State argues that this situation is more akin to one in which "an officer merely approaches an individual on the street and asks if he is willing to answer some questions." *Cockrell v. State*, 2010 Ark. 258, at 17, 370 S.W.3d 197, 207 (citing *Thompson*, 303 Ark. at 409, 797 S.W.2d at 451–52). Under *Cockrell* and *Thompson*, such an encounter is not deemed to be a seizure "because it is in a public place and it is consensual." *Id.* However, in *State v. Allen*, 2013 Ark. 35, at 4, 425 S.W.3d 753, 757, the Arkansas Supreme Court found that a game warden's actions in stopping a watercraft on Lake Hamilton and boarding it briefly to conduct a safety check constituted a seizure. The State attempts to distinguish *Allen* by arguing that, although Allen would not have felt free to leave while a game warden was

aboard his boat, Pickle was free to leave at all times prior to his arrest and was under no

obligation to comply with the game wardens' requests. We disagree.

Although Pickle was not physically restrained or threatened with arrest if he refused to

comply, the encounter went beyond that allowable under Rule 2.2, *Cockrell*, and *Thompson*. Rule

2.2 of the Arkansas Rules of Civil Procedure states:

> (a) A law enforcement officer may request any person to furnish information
> or otherwise cooperate in the investigation or prevention of crime. The
> officer may request the person to respond to questions, to appear at a police
> station, or to comply with any other reasonable request.

> **(b)** In making a request pursuant to this rule, no law enforcement officer shall
> indicate that a person is legally obligated to furnish information or to
> otherwise cooperate if no such legal obligation exists. Compliance with the
> request for information or other cooperation hereunder shall not be regarded
> as involuntary or coerced solely on the ground that such a request was made
> by a law enforcement officer.

Ark. R. Crim. P. 2.2 (2011). The circuit court admitted into evidence the Arkansas Hunting

Guidebook, a copy of which is available to everyone at local sporting goods stores and online,

which was presented by the prosecutor as evidence of Pickle's reasonable expectation of privacy

in the hunting context. The Arkansas Hunting Guidebook clearly states that "it is not legal to"

"refuse an officer's lawful request to inspect your wildlife, tackle, hunting equipment, devices,

license, or any item that can reasonably contain wildlife" or "interfere with an officer performing

their duties or flee from an officer." *Arkansas Game and Fish Commission Hunting Guidebook* 18

(2012-13). Therefore, we cannot agree that Pickle would have felt free to leave at any time prior

to his arrest. As a result, the encounter at issue here, during which the game wardens obtained

Pickle's name and asked him to identify his firearm, was a "seizure" under the Fourth Amendment and article 2, section 15.

Second, we reject the State's argument that Pickle did not have any reasonable expectation of privacy because he was in an open field. While the State correctly articulates the open-fields doctrine, which holds that a person has no reasonable expectation of privacy in open lands or fields, the doctrine is inapplicable here. *See, e.g.*, *Hudspeth v. State*, 349 Ark. 315, 322–23, 78 S.W.3d 99, 104 (2002). The open-fields doctrine applies to searches outside a property-owner's home or curtilage, on land visible to others, where the owner has no expectation of privacy. *Id.*, 78 S.W.3d at 104. It does not stand for the much broader proposition that an officer may detain and search a person simply because he happens to be standing in an open field.

Third, we reject the State's argument that Pickle had no reasonable expectation of privacy in his identity. Citing *Hiibel v. Sixth Judicial District Court of Nevada*, 542 U.S. 177, 185 (2004) (stating that "in the ordinary course a police officer is free to ask a person for identification without implicating the Fourth Amendment") and *Fowler v. State*, 2010 Ark. 431, at 2–4, 371 S.W.3d 677, 680–81 (stating that officers may ask an individual to approach their vehicle and give his name even absent reasonable suspicion), the State argues that because the game wardens' initial stop produced no prejudicial information or evidence against Pickle other than his name, the Fourth Amendment and article 2, section 15 do not apply. However, the State's reliance on *Hiibel* and *Fowler* is misplaced because both cases involved reasonable suspicion of a crime prior to law enforcement's initial contact with the defendant. As discussed above, Rule 2.2 allows officers to request that a person voluntarily provide identification or answer questions.

However, neither case establishes the broader rule that police officers may *demand* an individual's name or identification absent reasonable suspicion. As discussed above, a reasonable person in Pickle's circumstances would not have believed himself to be free to refuse the game warden's requests or terminate the encounter. Without reasonable suspicion, neither *Hiibel* nor *Fowler* provide authority for the game wardens' detention and search of Pickle.

Having established that none of the State's preliminary arguments provide a basis to affirm, we turn to the key inquiry in this case: whether game wardens must have reasonable suspicion in order to legally conduct routine hunting-compliance checks. The State urges the Court to follow Louisiana, Minnesota, and Montana in holding that game wardens may routinely conduct warrantless, suspicionless hunting-compliance checks without violating the Fourth Amendment. *See State v. McHughes*, 630 So. 2d 1259 (La. 1994); *State v. Colosimo*, 669 N.W. 2d 1 (Minn. 2003); *State v. Boyer*, 308 Mont. 276 (2002). The circuit court adopted the rationale presented in these cases and found that,

> Hunters and fishermen who elect to participate in those specialized activities do so with the understanding that everything from the guns they may use, the ammunition they may use, the amount and kind of waterfowl or fish they may kill or catch, the time when they may hunt or fish, and most everything else about their activity is regulated by the state.

Therefore, the circuit court reasoned, hunters like Pickle have no reasonable expectation of privacy as to game wardens' hunting-related inquiries. Alternatively, the circuit court stated that, even if a reduced expectation of privacy existed, the game wardens' actions did not violate Pickle's rights because the State's interests in conducting routine hunting-compliance checks are

8

sufficiently compelling, they cannot be achieved through less restrictive means, and the intrusion on Pickle was slight.

We cannot affirm the circuit court's determination that reasonable suspicion is not required for routine hunting-compliance checks because both Arkansas and federal law are exceedingly clear that, in those rare instances in which reasonable suspicion is not required, a different sort of safeguard must be in place: the stop or search must be conducted under a plan of explicit, neutral limitations that prevent the officers from exercising unbridled discretion. *Allen*, 2013 Ark. 35, at 4, 425 S.W.3d at 757; *Delaware v. Prouse*, 440 U.S. 648, 661 (1979) (holding that "except in those situations in which there is at least articulable and reasonable suspicion . . . stopping an automobile and detaining the driver in order to check his driver's license and registration . . . are unreasonable under the Fourth Amendment. This holding does not preclude the State . . . from developing methods for spot checks that involve less intrusion *or that do not involve the unconstrained exercise of discretion*") (emphasis added). The explicit, neutral limitations-test is a necessary second prong of analysis in cases where reasonable suspicion is not required. *Allen*, 2013 Ark. 35, at 4, 425 S.W.3d at 757; *Prouse*, 440 U.S. 648, 661 (1979).

In *Prouse*, the United States Supreme Court struck down Delaware's use of suspicionless automobile "spot checks," stating that "the 'grave danger' of abuse of discretion does not disappear simply because the automobile is subject to state regulation resulting in numerous instances of police-citizen contact." *Prouse*, 440 U.S. at 662. The Court specifically stated that, "given the alternative mechanisms available, both those in use and those that might be adopted," such as permissible roadblock-style stops, Delaware's use of standardless, unconstrained

9

individual vehicle stops unconstitutionally permitted officers to base such stops upon their own "unbridled discretion." *Id.* In *Allen*, the Arkansas Supreme Court applied the explicit, neutral limitations-test to a suspicionless stop by a game warden, finding a Fourth Amendment violation because the game warden relied solely upon his own discretion rather than the type of explicit, neutral limitations required in *Prouse*. *Allen*, 2013 Ark. 35, at 4, 425 S.W.3d at 757.

At the suppression hearing and on appeal, Pickle has repeatedly argued that exempting game wardens from the reasonable-suspicion requirement would allow unfettered discretion to make random stops based solely on the game warden's will or discretion. Although the State referred to both *Prouse* and *Allen* throughout its brief, it never attempted to articulate the explicit, neutral limitations that apply to routine hunting-compliance checks. Despite the fact that the Arkansas Hunter's Guidebook and relevant federal regulations were introduced at the hearing and both officers took the stand to testify, neither the State nor the circuit court specifically addressed whether current hunting laws and regulations, or possibly internal AGFC policies and procedures, provided the type of explicit, neutral limitations required by *Prouse* and *Allen*. The record is simply silent on this issue.

In fact, this case presents the same problems that required suppression in *Allen*. In *Allen*, a game warden stopped a boat on Lake Hamilton in order to conduct a warrentless, suspicionless safety-compliance check for items such as life jackets. *Allen*, 2013 Ark. 35, at 1, 425 S.W.3d at 755. Although no violations had been observed before the stop, the game warden boarded the boat, conducted a search, determined that the operator had been drinking, and charged him with boating while intoxicated. *Id.*, 425 S.W.3d at 755. The Arkansas Supreme

Court affirmed the circuit court's decision to suppress the evidence because the game warden lacked any legal basis for the stop and search, and the stop was not pursuant to a plan that placed explicit, neutral limitations on the game warden's conduct. 2013 Ark. 35, at 4, 425 S.W.3d at 757. For example, the court noted that the game warden tried to stop as many vessels as he could during each shift, but there were no explicit, neutral criteria for determining which boats to stop. *Id.*, 425 S.W.3d at 757.

Here, the game wardens also testified that they attempted to conduct as many hunting-compliance checks as possible, but there is no evidence to suggest that anything other than their own unbridled discretion determined who would be stopped. Likewise, the game wardens in this case appear to have gone beyond the scope of a routine hunting-compliance check when they chose to run an outstanding-warrants check on Pickle and discovered that he was a convicted felon. Officer Ashton testified that it was his own personal protocol to run such a check when a hunter did not have his hunting license in his physical possession. The record is silent on whether the warrants check was part of any explicit plan or policy governing the conduct of AGFC officers, or whether the game wardens in this case were doing exactly what the *Allen* and *Prouse* courts feared: exercising unbridled discretion.

Because the circuit court's order denying Pickle's motion to suppress fails to address a necessary prong of analysis, we hold that the decision was against the preponderance of the evidence. Without a finding that the game wardens acted pursuant to a sufficient plan of explicit, neutral limitations, we must hold that the stop and search violated Pickle's rights under the

Fourth Amendment and article 2, section 15. Accordingly, we reverse the circuit court's denial of Pickle's motion to suppress.

Reversed and remanded.

PITTMAN, WYNNE, and WHITEAKER, JJ., agree.

GRUBER and BROWN, JJ., concur.

GLADWIN, C.J., and WALMSLEY and GLOVER, JJ., dissent.

**WAYMOND M. BROWN, Judge, concurring.** I agree with the majority that this case should be reversed and remanded. I write separately to express my belief that game wardens may perform hunting-and-safety compliance checks without reasonable suspicion or explicit, neutral limitations. However, I believe that after a compliance check has been completed, any additional encounter must be based upon an explicit, neutral limitation as required by *State v. Allen*,[1] in order to prevent game wardens from relying on their own unbridled discretion. Therefore, I concur.

GRUBER, J., joins in this concurrence.

**ROBERT J. GLADWIN, Chief Judge, dissenting.** In this case, the game and fish officers used neutral limitations in their contact with the appellant. Therefore, the ultimate search incident to arrest was constitutionally permissible. I would affirm, thus I respectfully dissent.

---

[1] 2013 Ark. 35, 425 S.W.3d 753.

The primary authority cited by appellant in support of his argument is the Fourth Amendment to the United States Constitution, the language of which is mirrored in article 2, section 15, of the Arkansas Constitution, stating:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no warrants shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

These constitutional guarantees provide fundamental protection to all citizens from unreasonable and arbitrary searches. Furthermore, Arkansas law places restrictions on a law-enforcement officer's ability to lawfully stop and detain citizens. Ark. R. Crim. P. 3.1 (2014). These long-established and well-recognized legal principles also apply to Arkansas Game and Fish officers. *See State v. Allen*, 2013 Ark. 35, 425 S.W.3d 753.

The question presented is whether AGFC officers are subject to the same legal standards that all other law-enforcement officers are bound to follow before detaining a citizen while engaged in a hunting activity. If so, appellant claims that there is no legal or factual justification for the AGFC officers' actions in this case, which requires this case to be reversed and appellant's conditional plea set aside.

The circuit court recognized that the United States Supreme Court has held that a random investigative stop of a vehicle is impermissible. *See Delaware v. Prouse*, 440 U.S. 648 (1979) (holding that except in situations in which there is at least articulable and reasonable suspicion that a motorist is unlicensed or that an automobile is not registered, or that either the vehicle or an occupant is otherwise subject to seizure for violation of law, stopping an automobile and detaining the driver in order to check his driver's license and the registration

13

of the automobile are unreasonable under the Fourth Amendment). The Court balanced the permissibility of the law-enforcement intrusion on an individual's Fourth Amendment interest against its promotion of legitimate governmental interest, holding that because of the alternative mechanisms available, including the foremost method of enforcing traffic and vehicle-safety regulations through the observation of violations, the incremental contribution to the governmental interest of highway safety gained from the random spot checks did not justify the practice under the Fourth Amendment. *Id*.; *see also United States v. Brignoni-Ponce,* 422 U.S. 873 (1975). However, the circuit court held that a person who engages in hunting is subject to random stops, checks, and searches by game wardens.

The circuit court's holding acknowledges Justice Blackmun's concurrence in *Prouse, supra*, in which he stated:

> The Court, ante, this page, carefully protects from the reach of its decision other less intrusive spot checks "that do not involve the unconstrained exercise of discretion." The roadblock stop for all traffic is given as an example. I necessarily assume that the Court's reservation also includes other not purely random stops (such as every 10th car to pass a given point) that equate with, but are less intrusive than, a 100% roadblock stop. And I would not regard the present case as a precedent that throws any constitutional shadow upon the necessarily somewhat individualized and perhaps largely random examinations by game wardens in the performance of their duties. In a situation of that type, it seems to me, the Court's balancing process, and the value factors under consideration, would be quite different.

*Prouse*, 440 U.S. at 663–64 (Blackmun, J., concurring specially).

The majority holds that *Prouse* and *Allen* require the court to suppress the evidence because the AGFC officers had no reasonable suspicion to detain and search appellant and that the search was not pursuant to a plan embodying explicit neutral limitations. I agree that the AGFC officers had no reasonable suspicion that a violation had occurred and

14

acknowledge that appellant was not free to leave and was thus seized. However, the AGFC officers did have neutral criteria that supports the search. Further, our balancing process weighs in favor of the limited intrusion upon appellant.

Prouse and Allen are distinguishable from this case, as both are stop-and-search cases involving vehicles. Hunting is a highly-regulated activity that can be efficiently enforced only with this type of enforcement, above and beyond the admittedly regulated activity of driving an automobile or water craft. The majority holds that controlling precedent requires AGFC officers' actions to be either (1) based upon reasonable suspicion, or (2) pursuant to a plan embodying explicit neutral limitations. If reasonable suspicion is not required, the second prong must be met. In Allen, the Arkansas Supreme Court stated that,

> The Fourth Amendment requires that a seizure must be based on specific objective facts indicating society's legitimate interests require the seizure of the particular individual, or that the seizure must be carried out pursuant to a plan embodying explicit neutral limitations on the conduct of the individual officer.

2013 Ark. 35, at 4, 425 S.W.3d at 757 (quoting Brown v. Texas, 443 U.S. 47, 50 (1979)). Despite the contention that the State has failed to present any evidence or argument demonstrating that the AGFC officers acted pursuant to such a plan or policy, I disagree that this case poses the same concerns regarding unbridled discretion that mandated the outcome in Allen. As aptly noted by the circuit court in its order denying appellant's motion to suppress:

> [Appellant] asserts that the outcome of this case is controlled by the Arkansas Supreme Court's recent opinion in State v. Allen, which involved a suspicionless stop of a boat for the purpose of conducting a safety check. However, the facts of Allen are distinguishable from the facts of the case at bar. Factually, even though a game and fish officer was involved in the encounter with Mr. Allen, there is no indication in

15

the opinion that Mr. Allen was engaging in the type of fishing activity governed by Arkansas statutes and regulation or that the officer was attempting to conduct an inspection of a fisherman's catch as was the instance in *Colosimo*. Rather, in *Allen*, the officer was attempting to conduct an inspection "for life jackets and other safety items that they [boat owners] are required to have on their vessel." The court in *Allen* reached a conclusion based upon an expectation of privacy is involved. The analysis at issue in *Allen* has specifically been rejected in cases involving the highly regulated activities of hunting and fishing.

In *Prouse*, *supra*, the United States Supreme Court held that, in those rare instances where the Fourth Amendment allows intrusions absent individualized, articulable suspicion, law enforcement activities must be undertaken pursuant to specified "neutral criteria" rather than "standardless and unconstrained discretion." *Prouse*, 440 U.S. at 661. The Court, in *Prouse*, specifically stated that, "given the alternative mechanisms available, both those in use and those that might be adopted," such as permissible roadblock-style stops, Delaware's use of standardless, unconstrained individual vehicle stops unconstitutionally permitted officers to base such stops upon their own "unbridled discretion." *Id*. Likewise, in *Allen*, the Arkansas Supreme Court applied the "explicit, neutral limitations" test to a suspicionless stop by finding a Fourth Amendment violation because the game warden relied solely upon his own discretion rather than the type of explicit, neutral limitations required in *Prouse*.

The Arkansas Hunting Guidebook, a copy of which is available to everyone at local sporting-goods stores and online, was presented by the State as evidence of appellant's reasonable expectation of privacy in the hunting context. The Arkansas Hunting Guidebook clearly states that "it is not legal to" "refuse an officer's lawful request to inspect your wildlife, tackle, hunting equipment, devices, license, or any item that can reasonably contain wildlife" or "interfere with an officer performing their duties or flee from an officer." Arkansas Code

16

Annotated section 15-43-104 (Repl. 2009) provides that "[a]ll game and fish except fish in private ponds found in the limits of this state are declared to be the property of this state. The hunting, killing, and catching of the game and fish are declared to be privileges." Section 15-43-105(a) (Repl. 2009) covers related prima facie evidentiary matters and provides:

> (a) The possession of firearms in fields, forests, along streams, or in any location known to be game cover shall be considered prima facie evidence that the possessor is hunting.

These statutes and current rules of the AGFC form the very framework for the "explicit, neutral limitations" test in this case. Appellant's hunting party was not merely a group of individuals walking around on open public property. Appellant's shotgun was in plain view resting on a tree, along with two other guns, in a permissible hunting location, during regular duck-hunting season, and within allowed hunting hours, consistent with section 15-43-105(a). Based on that information, the AGFC officers approached appellant's hunting party and asked to check their identification, licenses, guns, and bags that might contain game. From that minimal amount of information, Officer Aston checked with NCIC to see if appellant had any outstanding warrants, and, at that point, discovered that he was a convicted felon. The methamphetamine and drug paraphernalia were found by Officer Aston in a search incident to appellant's arrest, pursuant to Arkansas Rule of Criminal Procedure 12.1 (2013), for being a felon in possession of a firearm. *State v. Henry*, 304 Ark. 339, 802 S.W.2d 448 (1991).

Although the United States Supreme Court has not further elaborated on the constitutionality of suspicionless hunting-compliance checks to date, other states that have

17

considered the issue overwhelmingly have upheld these checks against constitutional challenges. Several states, specifically Louisiana, Minnesota, and Montana, have concluded that no reasonable expectation of privacy exists in the hunting and fishing context and have given broad powers to game and fish officers to conduct such searches without the limitations of the Fourth Amendment. *See State v. Colosimo*, 669 N.W.2d 1 (Minn. 2003); *State v. Boyer*, 308 Mont. 276 (2002); *State v. McHugh*, 630 So.2d 1259 (La. 1994). In *Colosimo*, the Minnesota Supreme Court held that, because fishing is a largely recreational privilege that anglers choose to engage in with knowledge of the regulations governing their conduct, an expectation of privacy in all parts of an open boat or other conveyance, admittedly used to transport fish, is not reasonable. *See also Boyer*, *supra* (holding that engaging in this highly regulated activity requires anglers to assume the burdens of the sport as well as its benefits, and thus no objectively reasonable expectation of privacy exists when a wildlife-enforcement officer checks for hunting and fishing licenses in open season near game habitat, inquires about game taken, and requests to inspect game in the field.). In Arkansas, like in Minnesota, *see Colosimo*, *supra*, and Montana, *see Boyer*, *supra*, hunters must assume the burdens of hunting as well as the benefits.

Compliance checks such as the one by the AGFC officers in the present case are essential to the AGFC's stated purpose:

> The control, management, restoration, conservation and regulation of birds, fish, game, and wildlife resources of the State, including hatcheries, sanctuaries, refuges, reservations and all property now owned or used for said purposes and the acquisition and establishment of same, [and] the administration of the laws now and/or hereafter pertaining thereto[.]

Ark. Const., amend. 35, § 1. And, the authority to "regulate bag limits and the manner of taking game and fish and furbearing animals" and "fix penalties for violations" has been vested in the AGFC by amendment 35, § 8, and is codified at Arkansas Code Annotated § 15-41-203 (Repl. 2009). The highly dangerous and regulated nature of hunting and fishing demands compliance checks, including questioning and checking of hunting and fishing equipment and licenses, even though similar actions might not be reasonable outside the hunting and fishing context.

In the alternative, even if hunters enjoy any expectation of privacy at all, then that expectation is greatly diminished. In *People v. Maikhio*, 253 P.3d 247, 259 (2011), the California Supreme Court held hunting-compliance checks reasonable under balancing tests modified from that used in non-hunting cases like *Prouse*, *supra*, and *Brignoni-Ponce*, *supra*. The *Maikhio* court relied on the factors that the United States Supreme Court in *New York v. Burger*, 482 U.S. 691, 702–03 (1987), used for special needs and administrative-inspection cases, and applied them in the hunting context:

> Balancing the importance and strength of the state's interest and the need for the suspicionless stop and demand procedure against the limited impingement upon privacy resulting from that procedure, we conclude that the Fourth Amendment does not preclude a state from authorizing a game warden to briefly stop a person the warden encounters on a pier, in a boat, or in the field, who the warden reasonably believes has recently been fishing or hunting, to demand that the person display all fish or game that he or she has caught or taken, even in the absence of reasonable suspicion that the person has violated a fish and game statute or regulation.

*Maikhio*, 253 P.3d at 262–63.

Applying the factors considered in *Maikhio* to the hunting-compliance inspection in this case, there is clearly a compelling interest beyond mere law enforcement—the State's

19

control, management, restoration, conservation and regulation of birds, fish, game and wildlife resources—an interest entrusted to the AGFC by amendment 35 to the Arkansas Constitution, property laws, and regulations that recognize the paramount importance of these invaluable natural resources. The Arkansas Constitution perpetuates a public-trust doctrine requiring AGFC to control, manage, restore, conserve, and regulate the wildlife resources of the State. Ark. Code Ann. § 15-43-104; *see also Lewis v. State*, 110 Ark. 204, 161 S.W. 154 (1913) (holding that the fish and game of the state, ferae naturae, belong to the whole people of the state collectively). Wildlife is owned by the State and not subject to private appropriation except when done under regulations that protect the general interest. *See State v. Mallory*, 73 Ark. 248, 83 S.W. 959 (1904).

AGFC has a special governmental need outside the ordinary law-enforcement context to have its wildlife officers stop hunters and fishers near game and fish habitat, check for hunting and fishing licenses, inquire about game and fish taken, request to inspect game and fish in field possession, and request to inspect killing devices and hunting and fishing tackle. In this capacity, the AGFC officers act not only as law enforcers but also as public trustees protecting, conserving, and promoting conservation of the wildlife of the State by (1) protecting the State's wildlife resources from those who violate regulations promulgated for the sound management and conservation of the resource and (2) serving as front-line gatherers of information necessary for the intelligent formation and revision of laws, regulations, and policies affecting and regulating seasons, limits, management areas, food chains, and other factors related to the management and conservation of the wildlife.

Such an inspection by an AGFC officer for compliance with AGFC's regulations involves only a few questions and a brief detention usually of no more than two or three minutes, which is consistent with the AGFC officer's constitutional and statutory duties and falls far short of being analogous to an arrest. A check for a hunting license, coupled with a question about game, is easily standardized and minimally invasive. The potential interference with the activities of legitimate hunters and fishers is minimal, and the impact on the larger non-hunting and non-fishing segment of the populace is almost nonexistent.

The impact in this case consisted of a twenty-minute conversation and inspection of licenses and weapons for compliance with state and federal hunting regulations. It occurred during hunting season on known hunting land and did not involve the stop of a vehicle or vessel. Rather, appellant's hunting party was approached by foot in the area where they were hunting only after it was confirmed that they were engaged in hunting. Thus, the scope of the encounter was limited only to those practicing the highly-regulated sport of hunting. Finally, as Officer Aston testified, state and federal hunting regulations could not be adequately enforced if he was able to conduct inspections only after developing reasonable suspicion that a violation had occurred. Accordingly, in balancing a hunter's diminished expectation of privacy with the State's heightened interest in protecting Arkansas's wildlife, it is not unreasonable for an AGFC officer to perform a compliance check on someone who is hunting in the absence of reasonable suspicion that the person has violated a game statute or regulation.

The circuit court in this case correctly rejected appellant's reliance on *Allen* because the *only* commonality between that case and this one is the involvement of an AGFC officer. The officer in *Allen* did not merely approach Allen to ask some questions, but stopped and boarded his boat for a safety check. There was no indication that Allen was engaged in the practice of hunting or fishing, in which situations state and federal regulations would apply and the need to check for compliance with those regulations would arise. As the court in *Allen* held, the random stopping and boarding of a boat in that context is analogous to randomly stopping a vehicle without articulable suspicion of illegal activity. A check of someone who is fishing or hunting to inquire about that person's compliance with state and federal hunting or fishing regulations is not so random. Consequently, *Allen* is inapposite to this case. If this court looks to other cases, such as *Maikhio*, that have analyzed the constitutionality of hunting-compliance checks, it is clear that, even assuming, arguendo, that the Fourth Amendment and article 2, section 15, of the Arkansas Constitution are implicated in the sport of hunting, a compliance check does not infringe upon those rights.

WALMSLEY and GLOVER, JJ., join.

*Miller Law Firm*, by: *Randel Miller*, for appellant.

*Dustin McDaniel*, Att'y Gen., by: *Kathryn Henry*, Ass't Att'y Gen., for appellee.

*James F. Goodhart*, *John P. Marks*, *Jennifer R. Jameson McKendree*, and *Christian N. Parks*, Arkansas Game and Fish Commission, amicus curiae in support of appellee.